Thank you, Your Honors, and good morning, and may it please the Court. Peter Afrisiabi on behalf of Petitioner, who is present with me, Ms. Loamseejun. Your Honors, this case fundamentally presents what's a procedural issue. It's not a referendum on whether the government's characterization of her is right or her characterization is right. This is a procedural question about whether the BIA, on an ineffective assistance of counsel motion, used the wrong standard. And our submission is it did, because as a matter of law, the ineffective assistance of counsel motion established a plausible case of prejudice that Attorney Wong's conduct may have affected the outcome of the proceedings. So, I mean, you've now honed in on the procedural part. I mean, just to be clear, we're not reviewing whether there's a particularly serious crime at issue here, right? You're not. You're not reviewing whether this was, in fact, as a matter of law, a particularly serious crime. Indeed, under Bear v. Barr, when that's ultimately adjudicated, there's very limited review here anyway. Nor are you adjudicating whether, in fact, a cap claim was made out. All you're looking at is whether the record given on the ineffective assistance of counsel motion is one that showed that the underlying attorney failed in a way that may have affected the outcome. So, and the BIA said this was, or I guess the IJ and then the BIA said that this was cumulative evidence or not relevant, right? No. This motion to reopen was only heard by the BIA. BIA, okay. Yes. But that's what the BIA said. Well, the BIA said a few things, which are things of direct appeal courts. But the BIA said that this evidence would not change the outcome of the case. But you said that because it was cumulative or not relevant. Yes. I think that's probably a way to characterize it. And that is wrong as a matter of law in terms of the prejudice calculus. When you look They did consider three things, as I understood it. They considered the fact that she had and they had a letter. They considered her prior victimhood, if that's a term, but the fact that she'd been involved herself before she then moved up in the organization. And there was a third thing. I can't remember what the third factor was. And it looked to me like the evidence that you are complaining about would have been cumulative in the sense that it would have fleshed out in greater detail the nature and extent of her cooperation. But I'm having a hard time understanding why that would have made an impact on the decision when the board had previously considered that. I'll tell you exactly why.  And there's two, PSC and CAP. With respect to PSC, the immigration judge in the original trial said, I've looked at the plea agreement. I see her sentence. Tentatively, I find this to be a PSC. Counsel, it's not set in stone because the calculus under Frantescu-Bear v. Barr is never set in stone. It's a flexible calculus. And what she told him is, if you want to change my mind, I need evidence. And the evidence that wasn't given that bears directly on this, and that statement from the IJs at page 847 of the record is, and really the key evidence that I would ask you to really focus in on is, this Exhibit J on page 267 of the record is the government's downward departure motion, which is staggering. The district judge said, in his career, he had either never seen it or maybe once. 21 years as a district judge. And it contextualizes this victim-perpetrator line. He went down from, what, 235 to 47. I would call that a pretty staggering variance from the low end of the guideline range. It is. But why it's staggering was never given the immigration judge in the first case. But the judge knew that she had cooperated. Didn't the government provide some evidence with regard to her cooperation? Only that she had cooperated. And so this is why the cooperation… And that she testified in the grand jury, but had not had to testify before the petit jury. Exactly. And why does any of that even matter, whether it's a particularly serious crime? I mean, at the end of the day, the crime is the crime. The sentence was downward departure. But, I mean, the fact that she cooperated doesn't make it less of a particularly serious crime. It's not the fact that she cooperated, Your Honor. It's the fact that when you look at the analysis of whether something's particularly serious, you have to look at the circumstances that underlie the conviction. And the reason, tying to your question, Judge, about this victim-perpetrator line and why it's so important is the original decision just said, yes, she was a victim, then she moved up. When you look at her testimony, the district judge's statement, the government's motion, it was far more nuanced than that. And so a fact finder in the first instance, as our I.J. here said, I could be moved on this, a fact finder could look at that evidence and say, when she crossed that line from victim and took on the mother role, it didn't make this a particularly serious crime. And that's what a fact finder could have done. And the I.J. said she could get there. I guess I'm having the same problem Judge Nelson is having because our prior panel upheld the determination that it was a particularly serious crime. And the evidence that you're talking about was before the agency at the time, but not to the degree or to the extent that you urge it should have been. And I just don't see how that would have made any difference when the board knew that the court had already departed more than almost 200 levels, which is a huge departure based on her cooperation. Because what the agency didn't have the first time, for example, is Judge Frank's letter, his I-918 letter that explains why he's doing what he's doing. But they knew what he did. But the Francesco analysis requires one to actually look at the type of sentence imposed, not just the number. Tell me what does that mean, the type of sentence imposed? None of that changed. I mean, none of this evidence would have changed the type of sentence that was imposed. This evidence explains the type of sentence. That's fine. And that's why it's so important. But that's not how we do this. I mean, I guess I'm fundamentally trying to – I'm worried that we should cut you off at the pass because if we opened up the door to this, we're opening up a door to anyone coming in and claiming all kinds of new mitigating factors that weren't presented before. And the fact of the matter is it doesn't even matter. I mean, you've got some evidence, for example, the grand jury testimony, that most immigration lawyers will never be able to even see unless their client had previously been convicted and that information was turned over in discovery by the government. I mean, let's take a different hypothetical. Let's say that it was murder. And then the defendant – we all agree murder is a particularly serious crime. There's no debate about that. And then five years later they come in and say, well, he was abused, all these other mitigating factors. I think my response would be it's all irrelevant. Like, the fact of the matter is he was convicted of murder. I don't care that there were 100 mitigating factors. That's not the legal analysis. Can you show us where a court has looked at this? I'm just trying to get you out of the gate here. Like, where has a court looked at this and said we're going to dig deeper underneath the crime and look at mitigating factors to determine whether it's a particularly serious crime? Well, I think that's what Frantisco and Bear v. Barr say. I don't think it says that at all. Well, I think what they've said is it's not mechanical. You don't just look at the label of the crime in the sentence and say done. Yeah, but you look at the crime. Where have they said you get to look at mitigating factors? I think if two people are convicted of the same crime, then those things come across and we analyze them in the same way. We don't say, oh, this other person has all these other mitigating factors, so therefore it wasn't particularly serious. Where's the case that says we can even engage in this analysis? I think Bear v. Barr, pages 964 to 965, says nothing in the definition of a particularly serious crime limits the scope of permissible evidence. And I think if we look then at the CAT claim, which is second to the PSC claim, there we have evidence that we can look at the e-mails the attorneys were given show at the time of the underlying criminal prosecution there were threats that were directed back to family in Thailand. There was a threat, right, by the fellow inmate, and the Bureau of Prisons took action to move your client so that that threat could be neutralized. But the board also looked at the fact that the Thai authorities were stepping up their enforcement of sex trafficking rings. There had been no harm to her family in Thailand. I mean, that was all before the board. It's true, Your Honor. What difference is this more fulsome evidence going to make in the assessment of particularly serious crime? Well, I'm talking about CAT. The reason this evidence is— Even CAT, really, if there's no harm has befallen. Well, being threatened counts as harm to begin with. No, but hold on. You can't just come in and say, oh, we have new evidence of a threat. You have to show that it ties to the Thai government. There's nothing in the record about the Thai government not coming, protecting her. I disagree, Your Honor, for this reason. Let me—and I can explain it if you give me a couple of sentences. When the co-defendant threatened her, that fact was not given in the original trial. Judge Frank said she has confronted threats and similar co-defendants have confronted threats. That is very important because the threats were going also telling her your family back in Thailand can be attacked. Now, the original trial, that's the causation issue that was missing in the original trial. But she didn't testify at that trial. But I'll— Are you talking about the co-defendants that were ultimately convicted in the case? No, no. I'm saying at her original asylum trial, the causation evidence that ultimately was missing—  The merit hearing on asylum. —that could bridge—yeah, I'm talking about the torture. When you said trial, I referred to the trial in Minnesota. Sorry, no, the asylum. But more fundamentally, you said give you a few sentences. I gave you that. I still heard nothing out of your mouth that tied it to the Thai government. Threats from co-defendants does not count. You agree with that, right? I would agree with that, but there is evidence with respect to the government. Well, I'm waiting. I'm waiting. Yes. The police worked to smuggle women out through the passport lines with the criminal gang. That's in the record. The reason that's important is because when she—before she was ever in asylum proceedings, when she said, I'm worried because the police, which is in the ROIs that weren't given, the police worked with the gang. That connects it. The police are in league with the criminal organization. The Thai police. Yes. And they worked to smuggle the women out through special passport lines. And so when she's testifying before—in the criminal case, before ever being in an asylum proceeding where one would know that this stuff could matter about Kat, it's really important that she's telling the government the police in Thailand work with the gang. And so then when someone—when a co-criminal defendant says, we're going to threaten your family back there, of course she's worried because the police do work with them. And that's the evidence that was never given in the original trial and would bridge the gap. Okay. But the agency had before it the fact that she rose from the ranks of being one of the workers to actually being a boss in the organization and running the house in Phoenix and laundering the proceeds of the activities that occurred there to Thailand. So, again, I'm looking for something that's going to undercut the agency's determination that her conduct assessed against the statute resulted in a particularly serious crime. Back to that point, I think it's Judge Frank's letter, the government's downward departure motion, the— All of which the court took into effect and the agency knew when she got 47 months instead of 235 or more. Well, it didn't have those documents, and what it didn't have was the government lawyers explaining this line between victim-perpetrator and how she crossed it. But it explains why the court departed it down to 47, but the agency doesn't need to know that. If they can see that the government's representations at sentencing resulted in such a low sentence. But they didn't get the guidelines before, and they just got 47 versus 230. Maybe that happens all the time. They didn't know that it happened literally the only time this district judge had ever seen it. And so that contextualizes why it's a form of evidence. Can you answer a related question? What happened to her U visa application? Denied, Your Honor. Denied. Okay. And has she sought in any other way to adjust her status? The visa applications were denied. Those were denied as well. Those are administratively denied, and I believe they are pending a potential internal administrative appeal on the U visa. I see I'm running out of time, so I'll save it. Yeah, we've taken you over, so any other questions? Otherwise, we'll give you some time for a follow-up. Thank you, Your Honor. May it please the Court, John Stanton for the government. Judge Nelson, Judge Tallman, I mean, the government agrees that most of this evidence is cumulative and could not have made a difference under any standard, but some evidence isn't even cumulative. With respect to the acquiescence evidence that the position of counsel is referring to, I mean, I'll make it easy. I mean, page 709 of the administrative record was the board's first opinion. Everything after that was from the original record before the agency. The only acquiescence evidence they cite in this round of briefing is on the reply brief, page 19. Various pages on page 881 to 913 of the administrative record, it was literally the same acquiescence evidence that they originally put to the- So can I ask a more fundamental question? Sure. This argument sort of made me think about what evidence can you use to reopen in a case like this for a particularly serious crime? Because, I mean, he points to this generalized statement that, well, there's no limit on the scope of permissible evidence, but that can't mean what he wants it to mean, but where do we go to figure that out? I mean, I will tell you this. I mean, the way the immigration statute is, if the sentence is five years or more, it's a per se particular serious crime. She got four years now. It's not per se. It's not per se, but it is pretty close to that, and it was a crime against people. I mean, so in a case like this, so maybe my murder example is not good because murder would always be over five. So let's come up. But could you have two people similarly situated, sentenced to the exact same amount of time, and one would be a particularly serious crime and one would not because of other factors that weren't looked at? Is that possible? Yeah. I think it's possible. Please don't- Don't bind the government to that. Please don't bind me to future cases. I'm just a lovely trial attorney here. I'm not the attorney general. I would like to think it is possible that if you have a significant sentence and you're committed of a crime that may be legal in some jurisdictions but not others, I mean- She'd have a more sympathetic case had she not risen in the ranks. I'm thinking a minor role in the offense. Sure, sure. Perhaps so. Again, please don't bind me for future cases. But if she just provided transportation or really had like a really minor role in the conspiracy, which was very significant, I mean it's certainly possible. One thing that's unfortunate, whether it makes a difference, we'll have to decide, but one thing that's unfortunate is that the comments of a federal judge about this woman were not even in front of the IJ. That's unfortunate. I mean- I think it's deeply unfortunate that the judge went to the trouble of making these comments and with the idea that they would be read by somebody and considered and maybe they wouldn't be agreed with. But he was the one who heard all her testimony. He sentenced her. And, you know, there's a question about the delta between what was before the IJ at time one and this additional information we have now. But it's not a great system in which a district judge goes to the trouble of making all these statements and then they're just not put in front of the IJ. That's not an ideal way in which this should go. I mean petitioner argues similar to what Your Honor just said, that like the sentencing judge should be in the best position to determine whether a non-citizen-facing woman should be allowed to remain in the United States. In 1917, Congress agreed with that. It's not the judge's call. We agree with that. It's not the district court's call as to whether she remains in the United States. But in the comments, his desires on that front are notable but ultimately not legally relevant. What's more relevant is the contextualization of the offense. And I just think it's unfortunate that the IJ didn't have this information at time one. Whether it would have made a difference is the question, but I think it's unfortunate. I won't dispute it's unfortunate. That being said, as Your Honor insinuated, it's also a legal malady that like in the 1980s and 1990s, Congress, for better or for worse, enacted a lot of, for lack of a better word, get tough on crime laws, one of which was revisions to the immigration statute, which they withdrew the judicial recommendations against deportation remedy. Like Congress said, sentencing judges, I mean, look, all due respect, but your opinions that the noncitizens should not be removed are now irrelevant. Is her degree of cooperation relevant to the particularly serious crime analysis? I mean, would you agree that the IJ could consider that in assessing whether the crime was particularly serious, or do you actually dispute that it's relevant? Well, I mean, like it is relevant. The relevance isn't that great. That being said, as Judge Nelson and Judge Tomlin said earlier, the immigration judge was well aware that the petitioner had cooperated. The fact that the immigration judge didn't have all the specific details, I mean, we don't think. No, I understand. I'm just trying to understand what you think the inputs into the PSC determination are. So it sounds like degree of cooperation in IJ wouldn't err if he or she considered that. Is that fair? She did consider the evidence of cooperation, like originally the immigration judge, but just more of the same cumulative evidence. How about the victim? How about the fact that Ms. Lomstead was also a victim? Is that something that can be considered in a PSC? It can be considered. It was considered. It was considered. The immigration judge was. Oh, sorry. Go ahead. I want to ask about that because why can it be considered? Because that's not intuitive to me that that has anything to do with whether, I mean, the crime was still the crime. I understand Judge Tomlin's hypothetical of whether you were a leader or whether you were not a leader. That seems to play into the crime. But whether you cooperated, I don't understand why that's relevant to whether it was a particularly serious crime. I personally don't either, but I think the board has said something to that effect in a published opinion. It did emphasize, I believe the quote is in our brief, that, like, cooperation is relevant but not that big a deal. And the same thing with victimhood? Victimhood, I would imagine it goes to the nonsense of mental state, which, again, the agency found she was not, I mean, incompetent. I mean, she consciously decided to commit these criminal acts, notwithstanding that she herself was originally a victim. One issue in the case was the – I think I have this right – the bondage debt, essentially, as to one of the other people who were working in one of the houses and why it was that Ms. Salam Sijun took control of that debt. And is there any – what was before the immigration judge on that point versus what I think we're being told now, that the reason for that was essentially to protect this other woman from something even worse happening? I'm generalizing a little bit. I'm sorry. I kind of lost you a little bit, so can you repeat the question? My question specifically is on this issue of the bondage debt as to one of the other women who was working in this. What is the difference between what the IJ had at time one and what we're being told now about why Ms. Salam Sijun had that debt, was in control of that debt? With respect to the bondage debt, I mean, I don't think there was anything new about it. I mean, so – I mean, I'm sure the opposing counsel can correct me if I'm wrong. So, I mean, like the new evidence of – there was – if I'm recalling correctly, there was these threats from a co-defendant in the trial. There was more details regarding her cooperation. I mean, there was some evidence that her husband was going to testify as to her mental state. Regarding her actual back story, I mean, I just cannot recall what the difference, what the new evidence was as opposed to what the immigration judge originally considered. That being said, I mean, wherever it was, it was not any different substantively than what was before the IJ in the first instance. Mr. Kent, let me ask you one timing question. I didn't realize that the agency had a form now for the judge to fill out. Do we know the date and the timing sequence after the sentencing? Was it shortly after he sentenced her or some longer period of time? I don't know about the timing, but it's actually a different agency. It's sent to the United States Citizen Immigration Services, which is a little different from the immigration court. That was submitted in conjunction with her petition to adjust status? Yes, yes. My understanding, that potentially is not before the court right now. That actually makes sense to me because CIS is an agency driven by forms, and I would expect there to be a form. It's important work, but sometimes you have forms. And, of course, as we say in our brief, that application was denied. So, I mean, again, all due respect to the sentencing judge in this case. But, I mean, since 1990, and we cite cases from other courts where the non-existent tried to make a very similar argument as this, and the court said, I mean, look, I mean, the sentencing judge, I mean, look, it just doesn't matter. One of the things that the parties disputed a lot was the standard for prejudice here.  And, I mean, I was going through our prior cases. You know, Flores says it has to be a plausible grounds for relief. That's 2019. Blanco says it would not likely change the outcome. We go back into the 80s. It actually can make a difference, some likelihood. Does that standard, is that workable how we have it, or do we need to, I mean, because other circuits have gone a little further than what we've already done and clarified that it's, you know, reasonable probability. Do we need to do that in the Ninth Circuit? The government's position is that we're just talking semantics here, that of all the variations. You think that that is reasonable, sir? Yes. If we think the reasonable probability, of course, it's inherent in the plausible grounds that could change. I mean, of course, it's a reasonable probability. I mean, if nothing else, the Supreme Court, admittedly in the Sixth Amendment context, has expressly rejected the theory that Petitioner is making here that any conceivable. Has any other court adopted that? Because, I mean, that seems to be, and maybe because, I mean, he probably needs that standard. There's, like, there's literally no possible impact. I mean, that seems to be the standard that he's pushing. Is there any support for that in any other circuit? No, not in any other circuits, no. Every other circuit, every circuit that hears the immigration case, it's circuit for the number. So, I mean, everyone else does the reasonable probability standard expressly. A lot of times it's come from Strickland. The only outlier is the U.S. Court of Appeals for the Fifth Circuit. They say, yeah, actually, so you would win. So it's a higher standard of prejudice. But, again, we believe the standard of Strickland and Harrington from the Supreme Court should also apply here. I mean, Strickland was a death penalty case. So Harrington, the defendant, was facing a life sentence. I mean, we find it very incongruent that those types of defendants. They have a different standard for immigration than for a death penalty. I mean, the Fifth Amendment provides weaker protection for counsel. I mean, it's still meaningful, but it's still lower than the Sixth Amendment. The Sixth Amendment provides more protection for obvious reasons. I mean, the stakes are just higher in those contexts, death penalty and life sentences, as opposed to just merely, I mean, it's still serious, but merely being removed from the United States. Do you have a question? No, okay. But, yes, so I mean, yes, so it probably would be nice for the court to at least clarify some of its previous pronouncements regarding the threshold for prejudice. And so otherwise we'll get into disputes like this again. But, again, we advocate for the reasonable probability standard of prejudice. Otherwise, one piece of paper from a neighbor could theoretically, I mean, conceivably, maybe move the needle a bit just maybe, I mean, which would really bog down the immigration court. This is not one piece of paper from a neighbor, right? I mean, that's not really comparable to the case. Again, there's a question as to what to do with the new evidence, but I don't think that's really what we have here. I'm sorry? I don't think we have just one piece of paper from a neighbor. We have more. Just within the context of, like, articulating the correct standard. I agree we have more than just one piece of paper, but just our argument was only that, like, the petitioner's interpretation of this court's precedence is just too low a standard, too low a threshold for prejudice. So that's all I was saying. Yes, we actually have more than one piece of paper. Yes, yes. So, I mean, my time's almost up. I don't think there's any more questions. Okay. All right. Thank you. We'll give you two minutes for rebuttal. Thank you, Your Honor. A few quick points. Sentences beneath 60 months require a facts and circumstances analysis, and when one of the factors that the BIA and Frantescu's held, which Beare v. Barr and all this court's case law holds, is you must look at the circumstances underlying the conviction. That requires more than just knowing the sentence and the crime. The circumstances underlying the conviction itself define it. But they knew that she had cooperated, which would explain why there's a 200-level downward departure. They knew she cooperated, but they didn't know because the 200-downward departure wasn't just cooperation. It was also extreme victimhood. But the cooperation's important because the ROIs that weren't given explain the cooperation wasn't just— Again, you're pointing to something that, to get back to Judge Nelson's concern, most immigration counsel are not going to have access to reports of investigation unless their client was convicted and it was turned over in criminal discovery. True, and that makes this an extremely rare case. We're not opening Pandora's box with this case. And the cooperation is important because the cooperation wasn't just that she got before a grand jury and said, he was there, she was there, he was there. This is how the organization works. It's how it smuggles women. It's how they launder money using bank accounts, what they put in their luggage. I mean, it's immense detail, which makes her then an existential threat to the criminal organization. That wasn't in the first trial. And on Frantescu, the immigration judge at 847 said, I know she got 47 months. I know it was money laundering and sex trafficking are the charges. I may still find this not to be a PSC if you give me evidence, and that's why it's important. And to Judge Brass, your question about why she took control of the debt and the contextualization of that, it wasn't given at the first trial. The first trial, when you read the BIA's decision, it simply says she went from victim to criminal. But what her sentencing statement, what the government said, what the district judge said that wasn't given at the first trial showed that she didn't want to take on a bondage debt. She said no repeatedly. The girl was scared to be under the control of these other people, and so she said, okay, that was illegal, and she went to jail for it. Did Judge Frank make any comments on this piece of this? He, on this piece of it, not in his I-918, but at the sentencing transcript hearing, I believe he did talk about this. With respect to, I see I'm out of time, but Judge Tolman, you asked the question about the immigration form and when it was done. It was, if you look at the record at page 226, there's a letter from Judge Frank where he attaches the I-918. He sent it to Immigration Council, so it wasn't done as just some sort of admin agency thing. I just brought a form. No, I was just trying to establish the time. How soon after the sentencing? Was it reasonably contemporaneous? I believe it was a couple years because this was May. A couple years after he sentenced her? Yeah, this is May of 2020 is when he sent the letter. And I don't have the judgment in front of me here at the podium table, but I believe If it was 47 months, it would have been before then. I believe she was sentenced, if I want to say it was 2017 or 2018, she was sentenced and she had about six months left. And so she was out by, she was in ICE custody around 2018. So it was a couple years after that that Judge Frank sent this letter off to the council saying, here's the information. All of which, and it's not a single piece of paper, and this is why it's very important. Your case law is fine. The prejudice standard. You have multiple cases that have dealt with the crazy Hail Marys. Itabaria is one of them. We cited another one in our brief and explained it at length where a petitioner comes in and says, oh, I've got another piece of paper, basically. You know, it's a total Hail Mary, and this court can say, no way. It doesn't even pass the smell test. You have that back end already in the case law to protect you from people trying to back on motions. That case is a perfect example. That's why we explicated it in our reply brief at length. But what standard are you asking for? Because, I mean, I read your brief to say that you're advocating for literally no possible impact. I'm arguing. Is that the standard you're asking us to adopt? Literally no possible impact? Yeah, for me to lose, there has to be literally, basically, no possible impact. It's an absolute Hail Mary. Yeah, but I don't think that comports with the rest of the cases that I just read. You know, plausible grounds for relief, would not likely change, actually can make a difference. I think that's different than literally no possible impact. If there's daylight, it's not this case. Because what this court has said is that. You think you still meet these other standards? Yes, because this court has said that plausibility is not even a prima facie case. I think we unequivocally make out a prima facie case on PSC and CAT if the full record was given. And I think that's why the IJ said. But if you're interpreting it that way, then it does go to whether the government is right, that we need to be clear that these are all explanations of reasonable probability. Because reasonable, you agree that reasonable probability, at least your definition, you see daylight between these cases and reasonable probability. Yes, I do. The two cases I gave you, the Tarabia and the other one I'm blanking on the name, absolutely not a reasonable probability. Right, and the problem is if you're right about that, then the Ninth Circuit, I mean, maybe we need to fix it, maybe we don't, but then the Ninth Circuit is out of step with the other circuits on this. I don't think so, because I think we cited the Sixth Circuit case, which has the same standard you have, which is we're not looking to find a prima facie. I thought the Sixth Circuit said specifically it was reasonable probability. No, I don't believe it did, and we have that case in our brief. So is your position that reasonable probability is not the standard? I don't think reasonable probability is the standard. I think it's just plausible. I think reasonable probability could be misconstrued as being like a prima facie case, 51 percent, and this court has already said you don't have to make out a prima facie case. So reasonable probability, a chance, plausibility, that's sub 50 percent. It's just could a fact finder look at this, come to a different conclusion? And we know this fact finder could have, because she said give me a record beyond the plea agreement and the sentence, I may have a different opinion. She told him that at page 847. And so we know this very fact finder could have had a different take on this. And so when the BIA says we, the BIA, would come to the same conclusion, that's not the standard of a motion to reopen court. That's the standard of a direct appeal court or perhaps a motion to reconsider. But it's not a motion to reopen for ineffective assistance. And that's the root error. The I.J. here herself was willing to entertain a different outcome. Okay. Thank you, counsel. Thank you, Your Honor. We're ready to go over, but this was very interesting, and we appreciate both your arguments, and the case is now submitted. Thank you much. Thank you.
judges: TALLMAN, NELSON, BRESS